Good morning, everyone. The first argued case this morning is No. 131630, Senju Pharmaceutical Company v. Lupin Limited. Mr. Perry. Madam Presiding Judge, with your permission, I rise to the point of order for this morning. I wish to record for the record that this very day is Judge Pauline Newman's 30th anniversary. It marks her 30th year on this court this very day. And her presiding in this session this morning is an example of her continued devotion to this court and to the principles of the judiciary. And on behalf of my colleague, Judge Moore, and I, I am pleased myself, I am pleased to record this for the record. Thank you for permitting me to do that. Judge Flaker didn't ask my permission. I certainly did not, because I know what you would have said. Well, if you'd like to dissent, the two of us... about this much. All right. Mr. Perry, please proceed. Judge Newman, may it please the Court. After the original broader claims were invalidated by the district court in this case, the patentee sought re-examination pursuant to the procedures provided by Congress and in so doing surrendered significant claim scope, adding additional limitations, as this court recognized in its most recent decision in this limitation, precisely in order to avoid the prior art that had been asserted against the patents. What emerged from the re-examination is a very narrow set of claims that describes very specific parameters for this unique composition, a very narrow range of the active ingredient, gatafloxacin, a specific amount, 0.01%, for the excipient, EDTA, and a very narrow and unusual pH range of 5 to 6. Those were claims that could have been made in the original case that weren't? They were... The claims were... This is within the ranges of the original patent claims. The patentee on re-examination narrowed the ranges to these very specific claims in light of the prior art. The previous claims had broader ranges for all three elements of the composition. The re-examined claims are much narrower. As reissued... But you see what I find so troublesome, that they're supported in the specification. They could have been made in the patent. They weren't made until re-examination, and meanwhile, had there been no prior litigation, there'd be no problem. But there was prior litigation, a final judgment. Is that just superfluous? Do we pretend it didn't happen? Not at all, Your Honor. And the court has already ruled in the other litigation against Apotex that that prior litigation is res judicata, claim preclusion against my clients, as against Apotex. Your position is that you're, in this case, it's a different defendant and a different set of claims. Absolutely right. Is that your position? These claims have never been litigated against any defendant, and these defendants that are here in the courtroom today were not parties to that prior litigation. These claims have never been tested in court until this litigation. But the same prior art exists for these claims, or is there additional prior art that arose as a result of the re-examination? There's no additional prior art, because the priority date hasn't changed and the terminal date hasn't changed. Nothing has changed in the patent. These defendants have asserted one additional reference, the Rojanasicul electricity study, which has, in our view, nothing to do with the claims. But the same key prior art, the grass references, was asserted against the broader range in the earlier litigation. Our clients went to the patent office and said, we will narrow the range. We will narrow the range specifically on EDTA to .01%, because grass discloses that at .01%, EDTA has no effect, zero effect. And therefore, it could not have been predicted. Wait a minute. It says it has zero effect. Let's look at it. That's not my recollection of zero effect. Zero percent change, Your Honor, in Table 13, which is at page A2781. Thank you, Judge Moore. We're getting that, Judge Moore. We start on A2730. The text explanation that Dr. Grass provided is that for glycerol, which is the relevant molecule he was studying, three concentrations, .01%, .05%, and .1% were added to the donor solution, causing a progressive increase in permeability. Only the two higher concentrations provided a statistically significant increase in permeability. And then he goes on to explain that these increases in vitro were undoubtedly overstated, because in vivo, the action of the tiers and the cations present in that substance would reduce the permeability. And then Table 13, which is, of course, numerically, Judge Moore, on page A2781, shows a very slight change in the raw permeability coefficient from 4.47 to 4.53. Chief Counsel, we could spend the next couple of hours working on this chemistry, and I yield to my colleague, Judge Newman, and my colleague, Judge Moore, as chemists. So I don't find that terribly helpful to me, because what troubles me about your position is simply this. Judge Robinson, the district judge, heard this case at great length and listened to the experts. Is that correct? That is correct, Your Honor. And worked through all of this and balanced all of the factors, including the prior art and all the other factors that she's called upon to balance and came up with the conclusion. Now, we don't give deference as such to the trial judge, but I'm having trouble figuring out how at this level and given this cold record and given the 15 minutes you have, we are to sit here and rebalance all of those factors in your favor. Can you help me understand how that works? I can't, Judge Fager. I appreciate the question. Let me give the easiest path for me to be in my view. There is the most significant piece of prior art in favor of patentability is the MITRA reference. This is a survey document that looked over all of the prior art permeability studies and concluded that at these low levels, quote, EDTA was devoid of any effects and that using it in high enough amounts to be effective would be, quote, toxic to the patient. So this is what a person of skill in the art actually would conclude before the invention. The MITRA reference, Your Honor, is nowhere in Judge Robinson's opinion. Judge Robinson did not consider this very critical piece of prior art. This court has said... Well, you know what? She didn't consider it. You presented it to her, right? We presented it to her, Your Honor. But she didn't, in the opinion, address it. That's different from saying she didn't consider it. Did she tell you, I'm not going to consider it, I find it to be irrelevant or excludable for some reason? Judge Moore, she listed seven pieces of prior art that she explicitly was considering, three patents, three grass references, and Regina Nasekul. MITRA is not on that list. She didn't discuss it. She didn't address it. She didn't consider it. Are you citing MITRA for more than just when it quotes grass? Yes, Your Honor. She's not only quoting grass, but also the green study, which was not introduced itself, but through both grass and MITRA, which shows no effect of EDTA in mannitol at 0.01%, which she also didn't address. The only prior art study showed no effect at 0.01%. MITRA reports that. MITRA also reports that the in vivo effects of EDTA have not been investigated, because everyone agreed, and this was undisputed at trial, that all of these in vitro studies overstated it. So even this minuscule raw data change in grass, which he reports as zero, is an overstatement, both because it's in vitro and because of the size of the molecule and because of the pH. Judge Robinson failed to consider prior art. Hold on one second. So you're talking, everything you've talked about so far is about grass and MITRA and these other issues. Those are only related to the method claims. Are you relinquishing arguments on the composition claims? Because those weren't the prior art references about which she declared the composition claims obvious, and nor do they contain any corneal permeability limitations. They don't need to contain any corneal permeability limitations, Your Honor. The evidence submitted in the original specification and reexamination to the examiners was focused on corneal permeability. The unexpected results that nobody would have known. Well, she held they weren't unexpected. And, Your Honor, she got it wrong, and this Court sits in review of those kind of decisions. It was undisputed that there was a 27 to 40 percent increase in permeability at .01 percent in this composition. Nobody could have expected that. And this is an issued patent, clear and convincing evidence. What is the clear and convincing evidence that any person of skill in the art would have expected a 27 to 40 percent increase in permeability? There is none. Is your position that no estoppel of any sort arises from the prior final decision of invalidity of the claims in the original patent? A collateral estoppel, that's correct, Your Honor. This Court has already ruled on the res judicata or claim preclusion effect. That's not at issue in this case because these defendants were not in that litigation. On a collateral estoppel matter... Certainly, but these claims were issued on reexamination after that case was decided. So this is the first time that these claims have ever been decided. Would your argument be the same, that with these claims on reexamination, after the prior final judgment on the original claims, that the same defendant could be sued again on the reexamined claims? Or does your case turn on the fact that this is a different defendant? It's a different set of parties, Your Honor. Our position is we get one full and fair opportunity to litigate these new claims. But that was my question. Would your reasoning be the same? Could the patentee go back on the reexamined claims with all of the arguments that you've presented, that these reexamined claims are patentable over the same prior art, and sue the original defendant? The original defendant? Apotex? Yes. We did that, Your Honor, and this Court has already ruled that that was barred by claim preclusion, not collateral estoppel. That's already been decided. So your argument then requires that there be a new defendant because all the other issues are identical. The patent, the reexamined claims... I'm sorry, Your Honor. The reexamined claims have never been considered by this Court. After the original decision was entered, but before the judgment was entered, we sought reexamination. Congress provided, of course, for the extradited procedure after an obviousness objection has been raised. The PTO did that, issued the new claims. This is the first litigation that they've ever been litigated. This is the first judgment that has ever resolved them, and we're here today, the first time this Court has ever examined on the merits whether or not these claims... But Judge Newman's point is a perfectly valid point, and I puzzled about this as I read Judge Robinson's opinion. In the earlier Senju litigation, we held that the reexamined claims were essentially a subpart, if you will, of the original broad claims, and they were held originally obvious. Judge Robinson and we said, you know, it's just a subsection of that same thing. Judge Robinson said the reexamined claims were new. I'm not sure what she meant by that because we had earlier held they weren't new in a reexamined context. They are not new claims. Now, I think what Judge Newman is suggesting is that why should there be a different result now than there was in that earlier litigation with regard to the validity of the claims, even though there may or may not be collateral estoppel. Let me answer it in two steps. First, Congress specifically authorized reexamination upon a validity objection in court, so that if it could never happen, then that is a null section of the statute, and that's not correct. But then you would have to hold that our prior decision was wrong. No, you're wrong. And it would be behind us. I think as race judicata, the court decided that question. As collateral estoppel against different defendants, that's not the case because we are entitled to one full and fair opportunity. The second answer, Judge Klager, on the facts of this case, my colleagues have helpfully reproduced in their brief at page 34 this little Venn diagram that we have that shows the difference between the original claims and the other. They are new in the sense that they are this very specific, narrow subset. We are claiming now one composition, essentially this drug, this commercial embodiment of the patent. They don't want to innovate in this space. They don't want to design around this patent. This is an ANDA case. They want to copy this specific compound. That's all they want to do. And the preclusive effect of the reexamined claims is limited to this one drug, or two drugs. And that's what's at issue here, and that's a much narrower set of claims than was ever considered in the previous litigation, and one of the errors that Judge Robinson committed, we submit, is to start from the earlier analysis of the broader claims, whereas Congress has said, and this Court has said, that reexamined claims must be considered as if, because they are, independent new claims. I'd like to reserve the balance of my time. We'll hear from the other side. Thank you, Mr. Perry. Thank you. Okay, Ms. Zarkin. Good morning, Your Honor. Deanne Mazzocchi, on behalf of the Lupin Appellees, and I'll address all issues unless there's questions specific to the high-tech product, in which case Mr. Castellano can respond to any of those questions. The composition claims 12 to 16, I think it's very clear that those were obvious, and the district court correctly so found. The prior art had already taught fluoroquinolone compositions that contained the same EDTA levels, the same pH, the same additional ingredients listed in the dependent claims. So the district court also correctly found, and they've never disputed, that there was an existing motivation in the prior art to improve upon those existing formulations to use the more potent and next-generation gadofloxacin. Do I understand it right, based on her opinion, that CAT, the 456 patent, discloses use of a quinolone, but not gadofloxacin. Am I saying that right? Right, gadofloxacin. And it discloses a composition in exactly all of these ranges, 0.01 EDTA, 5.2 pH, which is between 5 and 6, and even 0.3 to 0.8 weight per volume of the quinolone it discloses, but it just happens to not be gadofloxacin? Right, it's an earlier generation. An earlier generation. And then Matsuza, a 470 patent, comes after that, and it claims and discloses the composition, which is gadofloxacin? Correct. And does it expressly say in it that gadofloxacin is a new and improved quinolone that could be used for including a quinus I solution? Yes. So does it, on its face, provide the motivation to combine? That's exactly right. I understand. Yes, and in fact, their expert never disputed that there was this motivation to combine, and their expert didn't even dispute that the reason why the EDTA was used in those formulations, it was known to work as a preservative and have all of these good effects. Mr. Perry was talking about unexpected results, and he said, I mean, I will tell you that Judge Robinson clearly considered them with regard to the method claims, but her opinion with regard to the composition claims doesn't seem to take them into account. Clearly, we've held on multiple occasions all secondary consideration evidence ought to be considered. So explain to me why, if anything, it's harmless error for her not to have considered them with the composition claims, given what she concluded about the results with regard to the method claims. Right. I think, first and foremost, when it comes to the composition claims, the only difference that was argued between the prior art compositions versus the claims is that the prior art compositions didn't contain gadafloxacin. So she certainly put forth the reasons why a person of ordinary skill in art would be motivated to select gadafloxacin, and since the appellants never presented to her any evidence suggesting that there was something unexpected about gadafloxacin being able to work in an ophthalmic composition, she didn't really have any secondary considerations evidence on the particular issue that was alleged to be the point of novelty issue. Are you saying all of the secondary consideration evidence regarding unexpected results is related to what degree of improvement might exist in corneal permeability, which isn't one of the claim limitations? Exactly. So if it's not one of the claim limitations, you can't possibly have the requisite nexus in order to have the secondary considerations even be relevant in the first instance. So she certainly considered the issue, but she actually noted in her opinion that because this type of information, the corneal permeability items were not relevant to, or were not contained in or part of the claims themselves, then they weren't relevant. So she considered it, but she explained why it wasn't material. And given that the person of ordinary skill in the art would have had the existing expectation of success that these compositions would work as ophthalmic formulations, there really was nothing more to decide. Does Claim 6 raise a different problem with regard to increased permeability from the ones in 12 to 16? I actually don't think that it does. To me, Claim 6, and again, the district court didn't even find the unexpected results to be persuasive when it came to Claim 6. And I think that that decision is also correct because Judge Plager, as you noted, Judge Robinson did go through all the prior art. She had the benefit of hearing all of the experts testify as to what the art would teach one of ordinary skill in the art. And she concluded that the art did not actually teach that 0.01 weight volume percent EDTA was some magic cutoff number where the EDTA's efficacy stopped. She relied on the new reference that was not before the PTO, the Roginoskul reference, that explicitly stated as low as 0.00037 weight volume percent, the EDTA was still going to keep working. So I think Judge Robinson rightly recognized, and she found, that there's basically a continuum when it comes to this EDTA. As the levels go down, you don't get the same magnitude of increase. As the levels go up, you do get the same magnitude. You do get an increased magnitude. So, you know, with that, the degree of the magnitude that they were talking about here that they observed with gadafloxacin, it followed that same trend. As you increase the amounts of EDTA, the corneal permeability increased. When you were at the 0.01 weight volume percent, you saw some increase, but it was not statistically significant. That's exactly what you would expect from Grass, because that's exactly what he reported, is that he saw a numerical increase, but he acknowledged it was not statistically significant. So in the context of the claims here, and the claims certainly don't, on their face, state that they are limited to achieving a particular threshold, or, you know, if it's 20% more permeable or anything along those lines, then, again, there really is no distinction between what would have been obvious to one of ordinary skill in the art and what they've claimed. So it's your argument, as I understand it, that maybe 0.1 EDTA, maybe one of skill in the art would think, based on these references, that 0.1 of EDTA may optimize corneal permeability, but 0.01 would still raise it, which is what all of the claim requires. Exactly, and that's what the art was actually teaching, is that, you know, and Grass itself acknowledges this, that as you increase the amounts of EDTA, so too do you see an increase in permeability. In fact, Judge Newman, I believe in, it was the Galderma case, you had noted in your part of the opinion in that case that one of the things we look for when we're talking about unexpected results is, is there any indication that something is bucking the trend? Well, here, gadifloxacin was behaving absolutely consistent with the prior art trends and what they had taught you to expect, which is that if you've got lower amounts of EDTA, you're going to see some increase, but not so much, and as you get to higher levels, you're going to see a continued increase in the rate of permeability. I have a, what will probably be a strange question, because I understand this really isn't something that was raised on appeal to us, and I don't even know if it was raised below, but why is everyone treating, and they have for purposes of this appeal, but why is everyone treating the raising corneal permeability language as a limitation? It's part of the preamble, and it didn't seem, it seemed to me it was a statement of intended use or benefit to be derived from use, and so I was kind of surprised that nobody made the argument to us that this isn't even a limitation and therefore isn't relevant to the scope of what the prior art needs to disclose. Right, and your Honor, if in fact, what happened is that in the Apotex litigation, that's how Judge Robinson construed the claims, that the preamble was an effective limitation, so then at the district court level, we obviously understood that Judge Robinson was not going to change her mind. Did our federal circuit, did you bring that issue to our court when we ruled, that was when we ruled 36? Correct. Did that issue come to our court in that appeal? I don't. Such that you knew you needed to leave it alone, it was settled in dead law? I don't recall that it was. I'm curious. Yeah, I certainly would point out that if this case were reversed and we had to go back to the district court, where she ruled and then they came back up again, that would obviously be an issue that we would raise if we had a judgment averse to us. I don't know that you would have that opportunity, right? If she's already construed the claim, you didn't object in this litigation, you didn't seek anything on appeal, I don't know that you'll have that opportunity to do it next time if there is a next time. You didn't reserve that issue. Well, because we prevailed below. So, I mean, I know that plaintiffs, or appellants at one point said, oh, you could have filed a cross appeal, but we couldn't do that because there's nothing to enlarge the judgment because we prevailed. So that's one of the reasons why we didn't exhaustively go through all the... I don't think we dealt with it in the earlier appetects. I don't know that it was... I don't recall everything that was put forth in the appetects brief, so I don't recall if that was at issue. Would you comment on Mr. Perry's position? Have you given any thought to this question that by statute they're entitled to reexamination, therefore they're entitled to have the reexamined claims considered ab initio? I actually... I disagree with his position on that for a variety of reasons. First, in the context... particularly in the context of this case, both the district court and the appellants made a variety of arguments that all of the district court's prior decisions should apply to our product because they said there really was no difference between our product and the appetects' product. So here again we have a scenario where despite having lost the appetects litigation... But that's infringement. I'm just thinking it's a matter of validity. Right. But from a... Oh, in terms of a matter of validity, I certainly think that all of the findings that the district court made in the prior appetects' decision that were left unappealed should still be considered to be found facts. All of the arguments that were made to this court on appeal at the Federal Circuit by the appellants that they lost on, they shouldn't be permitted to re-litigate those issues again. And I actually... Why not? Why not? The claims are different. They're narrower. You're a different party. There's no... There's no preclusion here, is there? Well, I think that there actually is issue preclusion. For example, the district court in the prior appetects litigation, she found that there was a motivation to combine gadafloxacin in the prior art formulation. They didn't appeal that issue. I objected to the fact that we were going to have to litigate that again, and Judge Robinson nevertheless let them do that and she re-decided it again in our case. But from the perspective of litigation resources and the fact that they didn't even appeal some of those findings, I think it's fundamentally improper that we had to litigate that again. But never... They have made an argument before Judge Robinson that she should recuse herself from your case because your case is an entirely different case based on a different defendant with different claims and that her prior position in the appetects litigation may taint her view of your case. Could they have made that argument? No, I don't think they... Well, they didn't, but I don't think they should have been able to make that argument. I mean, recusal... To me, recusal of a judge is a very... That tends to be more for a genuine conflict of interest. I mean, I don't... I think that the district court here was cognizant of the fact that she could not use... But you would agree she's not necessarily bound by her views from the earlier litigation, is she? Oh, I mean, could she have changed her mind on something and been persuaded for something else? Probably. Well, especially if new evidence had surfaced, right? This is a whole new record. What if suddenly they were able to proffer evidence that everybody believed gadafloxacin would never work in combination with EDTA, for example? It wasn't part of the record below. I mean, doesn't she have a right to consider that new evidence and possibly, therefore, reach a different conclusion? You know, I haven't thought in a lot of detail about that particular issue because that actually didn't... I mean, that didn't happen here, so that's not something I'd confront it. But, you know, philosophically speaking, I think a lot is going to depend on the scope of the issues presented. I mean, the extent to which something would, you know, fall within the law of the case doctrine, the extent to which... Well, there is no law of the case. Well... It's not a continuing case. Well, but in the context of to the extent they are trying to make allegations that our product is identical to Apotex's, so there's assertions they made about the Apotex case on the infringement side that should apply to us, I think fair is fair. You don't want to go for the goose is good for the gander approach. If she's going to do it on infringement, she ought to do it on validity. Exactly. But she basically declined to do it on anything. Well, she actually... Does that mean that you're in agreement that there was no finality to that prior decision? No. I think that the final decision was a final decision. There were issues that they... Applies only against that defendant. Is that... Do you agree with that? Yeah. I think that we should have been able to take full advantage of the prior Apotex decision because the same... But that was not your case in this case, was it? I mean, you're not standing on that as your position, are you? No, no, no. No, because the district court actually did, in fact, find things anew. Judge Robinson went through the whole routine all over again. Exactly. Your Honor, I see my time has run out. Okay. Thank you, Mr. Zaffi. Thank you. Now, Mr. Castadon, you asked for one minute. Can you tell us what you need to tell us in one minute? Your Honor, if there are no questions specific to HITECH, I'll surrender the remainder of the time. Okay. Thank you. Mr. Perry. That's the best argument we've heard. It's hard to follow. There was new evidence, Judge Newman and Judge Moore. The Senju 901 and 904 studies, which specifically analyzed this composition and found these unexpected results. They were submitted to the PTO on reexamination, and the three-examiner panel found, and this is at page A2692, patent owner has submitted unexpected results that are statistically significant. My friend misspoke on the statistical significance. It's absolutely undisputed that they are statistically significant at the 30-minute data point, which is the closest apple-to-apple's comparison to grass. What do we know on this unexpected results? First, Judge Moore, the claim preamble was construed as limiting. As corneal permeability, that was not appealed. So that's what this Claim 6 involves. We know that mannitol does not transport with EDTA, so it's zero for mannitol. We know that glycerol, it's a 1.3% increase. That's grass. Those are the only two molecules that were studied in vitro. We know that in vitro overstates because of in vitro versus in vivo, the tear film, the size of the molecule. Glycerol is 90 Daltons. This is about 375. And the pH factor, that was at 7. We're at 5 to 6, and transportability drops with pH. So when these inventors found a 27% to 40% increase in permeability, that's the area of the curve. A 27% to 40% increase is based on triple application. That's not what you claim. It was a study based on triple application of the solution. That's the 901, and the 904 is a single application, and it found the 40%. So we did both a triple application and a single application. Both found unexpected results. This is an issued patent. What is the clear and convincing evidence that those results... Wait, why do you say they found unexpected results? If she interpreted the prior art, namely Grass 1988, and Roja Jessica's, I'm not going to say it right, but you know what I'm talking about, the Roja Jessica School, whatever article. If she found that those demonstrated dose-dependent EDTA correlations with permeability, then why does it matter that you have a separate study that also showed that when you use it in your compound it has those results? Judge Newman, may I answer? Yes, please. Thank you. Your Honor, dose-dependent means less is transported the lower the concentration. If we look at the table in Grass, at 0.1% we have a 307% change. At 0.05% we have an 88% change. At 0.01% we have a 0% change. That's what the prior art taught, that as you drop the concentration you go to zero, and you go to zero precisely at 0.01%. We know from MITRA that a person of skill in the art at the time, not a paid litigation expert, expected it to have no effect. And when they studied this particular... When you say percent change, but yet the raw numbers demonstrate a change, you're right, it doesn't rise to the level of statistical significance according to this until a certain point, but the raw numbers do demonstrate the change. And on the raw numbers it's 1.3%. Again, 307% to 88% to 1.3%. And our studies show 27% to 40% with statistical significance. That is a dramatic and unexpected result. And the examiners, whose findings, the finding of fact by the PTO, is entitled to some weight, made that precise determination. When you say unexpected, do you mean that these inventors didn't have any idea what they were doing, and so the fact that this experiment proved successful was a great surprise to them? Or do you mean unexpected in terms of someone of ordinary skill at that time looking at the record what might have been thought about? The latter, Your Honor. Obviously the inventors were after something that they expected to be successful. Well, they were trying to develop. This is the first successful gatafloxus in eyedrop. This is a very difficult compound to get in the eye. They experimented for a year and a half, sacrificed many, many rabbits to try to find something. They tried a huge range of excipients and none worked. There's extensive testimony about they tried to do it every which way. And this particular concentration, which no one had literally thought to try, I mean this was eight, ten years after those original patents. This was totally unexpected, Your Honor, because this concentration was not. And so this peculiar composition, the one that was approved by the FDA, and again, this patent only claims this very specific composition, that's what was unexpected and unusual and patentable. Any more questions? Thank you all. This has taken as a submission.